IN THE

# SUPREME COURT OF TENNESSEE,

FOR THE

# MIDDLE DIVISION.

---

NASHVILLE, . . . DECEMBER TERM, 1872.

---

## BASS v. THE STATE.[*]

1. CRIMINAL LAW. *Assault with intent to commit murder in first degree. What indictment must state. That it was committed with a certain weapon, etc.* An indictment for an assault with intent to commit murder in the first degree which charges that the defendants on, etc., "feloniously and with malice aforethought did assault W. M. Smith with intent to commit murder in the first degree upon him, the said W. M. Smith, contrary to the form of the statute," etc., is bad. This offense was only a misdemeanor at common law, and was made a felony by sec. 4626 of the Code, and is not aided by sec. 5119, and the manner of the assault must be set out and described in the indictment as that it was committed with a loaded gun, knife, or pistol, or other instrument capable of producing death; that it was made deliberately on premeditation to commit murder in the first degree. Sec. 5128 construed.

Case cited and overruled: Harrison v. The State, 2 Cold., 232.

Code cited: Secs. 4626, 5119-23, 4615-27-28.

---

[*] This case was decided in 1870.

Bass *v.* The State.

2. SAME. *Same. Bill of exceptions. Imperfect transcript. How it will be treated by Supreme Court.* Where the transcript contains no bill of exceptions, but does contain a paper styled in the margin " charge of the judge," the court say this paper could only be made part of the record by bill of exception. Possibly, if it had been set out upon the minutes it would have been regarded as part of the record. Where the minutes of the court below and the bill of exceptions have not been signed by the judge of that court, from such an imperfect record, the court will treat the deficient transcript as having been filed as a writ of error; and though no reason be stated for the same, the court will arrest the judgment and remand the prisoner to jail for another indictment, where a conviction was had upon a defective one.

3. SAME. *Minutes not read and signed each morning. Consequences.* Failure to read and sign minutes each morning in open court by judge discussed at length and much reprehended; .many questions unsettled . suggested growing out of the contingencies of such failure.

Code cited: Sec. 4101.

4. SAME. *Clerks. Recitals made by. How regarded.* The court say: "The uniform course of decision in this State has been to disregard recitals made by clerks, outside of the certificates which they are expressly required by law to make. But in a case of such magnitude and importance as this, we cannot utterly ignore the statements of the clerks."

Cases cited: McConnell *v.* Read, Mart. & Yerg., 225; Hunt *v.* Lyle, 6 Yerg., 417; Miller *v.* Holt, Cooper, Overton, 86; Craig's lessee *v.* Vance, *Ib.*, 141; Burton *v.* Pettibone, 5 Yerg., 443.

5. SAME. *Jury. Where record fails to show affirmatively that the entire jury were sworn is error.* Where the jury were selected on two different days, and it appears only of record that those last selected were sworn, this statement excludes the idea that the others were duly qualified, and the error is not cured by Code, sec. 5242.

Code cited: Sec. 5215-42.

---

FROM RUTHERFORD.

---

Appeal in error from the Criminal Court of Rutherford county. THOS. N. FRAZIER, Judge.

ATTORNEY-GENERAL HEISKELL for the State.

No counsel marked for Bass.

Bass *v.* The State.

NELSON, J., delivered the opinion of the court.

The record in this cause is the most remarkable of any we have had occasion to consider.

Nine negroes were brought before us upon a document purporting to be a transcript of the record from the Criminal Court of Rutherford county; from which it appears that eight of them were sentenced to ten years imprisonment in the penitentiary, and one of them (Allen Fondley, colored), to five years. The novelty of the cases arises upon the following certificates by the former and present clerks, viz.:

"On Saturday, January 22, 1870, there appears the judgment (page 13), of the court, in which it says: 'Defendants thereupon prayed an appeal to the present term of the Supreme Court at Nashville, which is granted them, and tendered their bill of exceptions, which were signed and sealed by the court and ordered to be made part of the record in this cause.' Now, the fact is, there never was a bill of exceptions filed, and it being proper that the entry should be made in those words, the attorney for the defendants informing the clerk that he intended to make out a bill of exceptions. The motion and entry were made the last day of court, and there being more entries than the clerk was able to enter upon the minutes in time to be signed that day, at the request of one of the defendant's attorneys who wished that before the bill of exceptions were made out that another attorney in the defense who was, unavoidably, absent, and who he wished to assist him in making out the bill of

Bass v. The State.

exceptions before being signed by the judge. The court ordered (verbally) the clerk to leave the minutes open, and whenever the bill of exceptions were made out and agreed to, to bring the same, together with the minutes, to him, to Nashville, to sign. Matters stood thus until the seventh judicial circuit was taken up in the Supreme Court (I think it was in March), when Capt. F. B. Darragh, one of the attorneys for the defendants, informed me that he had seen his honor, John Hugh Smith, Judge, etc., and also Thos. H. Coldwell, Esq., Attorney General and Reporter for the State, had withdrawn his appeal to the Supreme Court, and with a verbal order from Judge Smith to enter upon the minutes. In the meantime, the prisoners had been taken to and placed in the jail at Nashville to await their trial in the Supreme Court. The entry, withdrawing the appeal, was not made out until the May Term, 1870. The minutes were not then, nor are they yet, signed by the judge—that is, the judgment referred to January 22, 1870. The bill of costs was made out against the defendants, fi fa, returned nulla bona, and judgment rendered at May Term, 1870, against the State, which has been settled. This statement has been made at the request of A. J. Caldwell, Attorney General for the counties composed of the criminal district of Davidson and Rutherford.

December 10, 1870.

" MINER L. FLETCHER, Clerk.

" By WM. P. HENDERSON, Deputy Clerk."

"State of Tennessee—County of Rutherford.

"I, Thomas B. Fowler, Clerk of the Criminal Court of said county, hereby certify that the foregoing transcript of *State of Tennessee* v. *Nathan Bass, colored, et al.*, together with a statement of the former clerk of this court is true and correct, as the same is of record upon the minutes of the court and on file in my office. Given under my hand at office in Murfreesboro, this 12th day of December, 1870.

"THOS. B. FOWLER, Clerk."

There is no bill of exceptions in the transcript before us, but nine of its pages contain a paper styled in the margin charge of the judge. This paper could only be made part of the record by bill of exceptions, according to the uniform practice in this State. Possibly, if it had been set out upon the minutes, although such has never been the practice, we would be constrained to regard it as part of the record.

The uniform course of decision in this State has been to disregard recitals made by the clerks, outside of the certificates which they are expressly required by law to make. See *McConnell* v. *Read*, Mart. & Yerg., 225; *Hunt* v. *Lyle*, 6 Yerg., 417; *Miller* v. *Holt*, Cooper, Overton, 87; *Craig's lessee* v. *Vance, Ib.*, 141; *Burton* v. *Pettibone*, 5 Yerg., 443

But in a case of such magnitude and importance as this, we cannot utterly ignore the statements of the clerks, and feel constrained, by our sense of duty, to observe that we cannot too strongly reprehend the practice which has grown up in some of the inferior tribunals, of disregarding the mandate in the Code,

sec. 4101, that "the minutes of the court shall be read, each morning, in open court, and signed by the judge." This has been the law of this State, at least, since the act of 1809, chap. 49, sec. 20, Car. and Nich., 205. The objects of reading and signing the minutes in open court, are to enable attorneys, suitors, and the public to know what has been done during the term; to prevent improper entries from being made upon the record; to correct mistakes before the minutes are signed, and to have the official sanction of the judge as to the correctness of the entries of each days proceedings. It never was contemplated that the minutes should be signed at any other time, or place, than during the term and in the court-house, in public view, or where, at least, the people may attend at pleasure. A signature, at chambers, where none, or a part only, of the counsel are present, is liable to the grossest abuses. A signature in another town or place, after the court has adjourned, and when the business transacted may have been forgotten, often creates the danger or suspicion of surreptitious entries, and is derogatory to that verity which has been uniformly ascribed to records. Moreover, in the event of the death of the judge, before the period fixed for the signature, would create the utmost perplexity and embarrassment in regard to the unauthenticated proceedings if his signature is necessary, as we are inclined to think it is, under the statute, to give validity to the entries upon the minutes. But we do not decide this point, as its decision is not absolutely necessary. His death during the term is not, so far

as our examination has extended, provided for in the
Code, as it was, to some extent, by the act of 1794,
chap. 1, sec. 8, Car. and Nich., 204.    But even the
act of 1794 did not provide, expressly, for the signa-
ture of the bill of exceptions in the event of the
sudden death of the judge who tried the cause, or for
the admission of evidence before his successor, from
the notes of counsel or otherwise, to enable him to
sign the bill of exceptions.

The certificates of the clerks in these cases are
suggestive of questions not expressly determined in
this State which may well deserve the consideration
of the legislative department, and which we do not
decide in this cause.    If a prisoner is put upon his
trial, and the presiding judges die before its conclu-
sion, has the prisoner been put in jeopardy?    If judg-
ment is rendered against him, upon the verdict of a
jury, and he prays an appeal, and the judge dies be-
fore the signing of the bill of exceptions, shall he be
deprived, by the act of God, which is beyond his
control, from having his cause considered in a revising
tribunal to which he has the right to appeal?    If in
such a case the judge's charge, in his own handwrit-
ing, is filed, with the papers or otherwise shown to
be in existence, may no remedy be provided for mak-
ing it part of the record?

If we felt at liberty to notice the paper copied
into the record and purporting to be his honor's
charge, there are errors in it for which we would be
constrained to reverse the judgment; but we are re-
lieved from the consideration, of the questions sug-

gested and of the doubtful parts of this transcript, by errors appearing in the proceedings which are properly authenticated.

1. It appears, from the record of the proceedings, during the term at which the plaintiffs in error were tried upon the indictment, that the sheriff returned into court "a panel of jurors," from among whom eight jurors were selected, on the 18th January, 1870, and the panel being exhausted, the sheriff was ordered to summon another panel, to appear at the meeting of the court on the next day, and the jurors selected were placed in charge of a constable, who was duly sworn, etc. It is further shown that on the next day the said eight jurors "returned, also, into court in custody of Thos. L. Ford, the constable sworn to attend them, and the sheriff having returned the additional panel of jurors summoned by him, by order of the court, on yesterday, the following persons were chosen, to wit: Thos. Hays, W. I. Hughes, Michael Quinn, and E. Compton, all good and lawful men, who being elected, empaneled, tried, and sworn well and truly to try the issue joined between the parties," etc. In two subsequent entries the names of the twelve are stated as the jurors, but it is nowhere stated that the entire twelve were sworn. According to any correct rule of grammatical construction, it appears that four only of the jurors were sworn, and we cannot, in a case of felony, presume in favor of the regularity of the proceedings in the court below, that the jurors were all sworn, when the statement that four were sworn excludes the idea that the others were duly

Bass *v.* The State.

qualified. The error is not cured by the Code, sec. 5242, nor could it be cured by a legislative enactment, as the swearing of the jury and their action under oath is an essential and indispensable element in every jury trial. It must appear, affirmatively on the record, that the jury were sworn, or it will be error. See cases cited in 1 Wat. Arch. Cr. Pl., 624, (*g*). And it is expressly directed by the Code, sec. 5215, that "in empaneling a jury for the trial of any felony, the court shall not swear any of the jurors until the whole number are selected for a jury." The statements in the record, that "the jurors aforesaid, upon their oath aforesaid, do say that said defendants are guilty," etc., and that "the jurors aforesaid, upon their oaths aforesaid, do say that, as a punishment for said offense," etc., would, in the absence of the narrative as to the precise manner in which the jurors were sworn, well warrant the conclusion that they were lawfully sworn; but the words, "upon their oath aforesaid," refer alone to the previous part of the record; and there, as already stated, it clearly appears that four only were sworn. The affirmative statement relates to them and not to the eight others. The expression, "all good and lawful men," refers to the four alone; and it was so obviously within the power of the Circuit Court to cause the record to state, with accuracy and precision, what was done, that we will, in a case situated like this, presume nothing.

2. But an objection equally fatal to this proceeding arises upon the indictment itself. It charges that the defendants on, etc., "feloniously and with malice afore-

thought, did assault William M. Smith, with intent to commit murder in the first degree upon him, the said William M. Smith, contrary to the statute," etc. This indictment is sustained by the case of *Harrison* v. *The State*, 2 Cold., 233, to which we have been referred by the Attorney General; but we hold that the weight of reason and authority is against that case, and feel constrained to overrule it. An assault with intent to commit a felony was not a felony but a misdemeanor only at common law. Such assaults were first made indictable as felonies in this State by the act of 1829, chap. 23, secs. 52, 53, 54, Car. and Nich., 325; which sections were carried into the Code, secs. 4615, 4627, 4628, and by the Code various other felonious assaults were created which it is not material here to consider. An indictment which describes the offense of a felonious assault, with intent to commit murder in the first degree, cannot be aided by the Code, sec. 5119, for the reason that the offense of murder in the first degree, as well as the felonious assault with intent to commit that species of homicide, were alike unknown at common law.

An assault at common law is defined to be an attempt, with force or violence, to do a corporal hurt to another: 2 Wat. Arch. Cr. Pl., 39, 40. In view of many cases which have been adjudged, it is not inappropriately defined "to be an attempt, or the unequivocal appearance of an attempt, with force or violence, to do a corporal injury; and may consist of any act which shall convey, to the mind of the person set upon, a well grounded apprehension of perso-

nal violence:" 2 Waterman's A. C. P., 41.   Liter-
ally, one person could assault another with intent to
commit murder in the first degree, but unless the
assault was coupled with a present apparent ability to
effect the purpose, it would not fall within spirit and
meaning of the statute.   The word "assault" does
not, by itself, convey anything more than the idea of
a common assault.   The words "with intent to com-
mit murder in the first degree" convey nothing more
than the idea of an unexecuted mental purpose.   But
where the indictment charges that the assault was made
with a loaded gun, with a knife or pistol, or other
intrument capable of producing death; that it was
made deliberately, or with premeditation, and with the
intent to commit murder in the first degree, then the
compound offense of murder in the first degree, as
distinguished from murder at the common law, and
the intention and ability to commit that specific grade
of murder, is fully charged and meets the requirements
of the statute.   And then, when the prisoner or de-
fendant demands, as under the Constitution he has the
right to do, "the nature and cause of the accusation
against him, and to have a copy thereof," he is fully
informed as to both, and may prepare for his defense.
To allege that he made an assault, etc., does not de-
scribe the nature of the accusation; but to charge
that he made it with a deadly weopon, named in the
indictment, does inform him, and is the only correct
mode of informing him, as to the nature and cause
of the accusation.   It is no answer to this to say
that it is sufficient, as a general rule, to charge the

offense in the words of the statute. While this is
true in a certain sense, it is not literally true in any
sense. Would any judge or lawyer be heard to con-
tend that it would be sufficient, in an indictment for
murder, to charge that the defendant did "unlawfully
kill a reasonable creature in being?" or, for man-
slaughter, that he is guilty of "the unlawful killing
of another, without malice, express or implied?" or,
for rape, that he had "unlawful carnal knowledge of
a woman, forcibly and against her will?" or, for rob-
bery, that he is guilty of "the felonious and forcible
taking, from the person of another, goods or money
of any value, by violence or putting the person in
fear?" Here the language quoted is the language of
the statute, but no authority, English or American,
would sustain an indictment couched in such general
language. In such cases the assault must be charged,
the person injured must be named, and such other
description, of the act done, be given, as will bring
the offender within the spirit and meaning, as well as
the letter, of the statute. Would it be sufficient, in
an indictment for arson, to charge the defendant, in
the language of the statute, with wilfully and mali-
ciously burning the house, or outhouse, of another,
without stating whose house was burned? or, in an
indictment for burglary, to charge him, in the language
of the statute, with "breaking and entering into a
mansion house, by night, with intent to commit a
felony?" How would the defendant be apprised by such
general language of the nature and cause of the accu-
sation against him? It has been well said that "every

crime must appear on the face of the record with a scrupulous certainty, · so that it may be understood by every one, alleging all the requisites that constitute the offense, and that every averment must be so stated that the party accused may know the general nature of the crime of which he is accused, and who the accusers are, whom he will be called upon to answer; and as a branch of this rule it is to be observed that, in describing some crimes, technical phrases and expressions are required to be used to express the precise idea which the law entertains of the offense." 4 Sharsw. Black., 306, note.

There can be no question that, in some respects, the excessive strictness and technicality required in indictments has, in some instances, had the effect to embarrass and perhaps defeat the ends of justice. But such blemishes tend only to display the beauty and symmetry of our criminal jurisprudence, and to remind us that our sturdy ancestors, who battled for ages against the atrocities of the privy council, the star chamber, the high commission, and other devices of tyranny and prerogative, were taught by experience the necessity of protecting themselves and their dearly purchased liberties by every possible precaution. Their labors have descended to us, hoary with the conflicts of centuries, and sanctioned by the greatest intellects that have ever adorned the law, and it remains to be seen whether "the wild spirit of innovation and untried experiment is better than the accumulated wisdom of ages. Blackstone, in guarding the people of England against the disuse of juries and the introduc-

tion of "new and arbitrary methods of trial, by justices of the peace, commissioners of the revenue and courts of conscience," has used language that may be well applied to the charges so frequently advocated in the forms of indictment and criminal procedure. His language is, that "however convenient these may appear at first, (as doubtless all arbitrary powers well executed are the most convenient,) yet let it be again remembered that delays and little inconveniences, in the forms of justice, are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon this sacred bulwark of the nation are, fundamentally, opposed to the spirit of our Constitution; and that, though begun in trifles, the precedent may gradually increase and spread:" 4 Sharsw. Black., 359, M.

While there is some conflict in the authorities as to the necessity of averring the use of a deadly weopon in indictments for an assault with intent to commit murder, the principle which we have determined in this case is sustained in the *State* v. *Johnson,* 11 Texas, 22; *Trexler* v. *The State,* 19 Ala., 21; *Jennings* v. *The State,* 9 Mo., 852; *People* v. *Petit,* 3 Johns, 511; *State* v. *Patrick,* 3 Wis., 812. See also the precedents of indictments, upon English statutes, similar to but not identical with our own, in 2 Wat. Arch. Cr. Pl., 1, 5, 19, 20, 21, 25, 28, 33, 34, 35, 69, and notes p. 70.

This conclusion is also fortified by the provision in the Code, sec. 5123, declaring that, "so, also, where the intent with which, the mode in, or the means by

which, an act is done, are essential to the commission of the offense, and such offense may be committed with different intents, in different modes, or by different means. If the jury are satisfied that the act was committed with one of the intents, in one of the modes, or by either of the means charged, they shall convict, although uncertain as to which of the intents charged existed, or in which mode, or by which of the means charged such act was committed." Without expounding this entire section, it is manifest that, among other things, it was intended to embrace an assault with intent to commit murder in the first degree, where the mode of the assault is described differently in different counts, as for example, with a gun, ax, bludgeon, or by strangulation, etc.

3. From the imperfect and unsatisfactory record before us, and a supplemental certificate made by the clerk, in which he states that the minutes of January 21, 1870, showing the finding of the jury and the judgment of the court were signed by the presiding judge, it may be inferred that the subsequent entries showing the motions for a new trial and in arrest of judgment, as well as the granting of the appeal were not signed. Under these circumstances we treat the imperfect transcript, which was filed December 14, 1879, as having been filed as a writ of error, and while the rule for a new trial and the motion in arrest are not before us, yet it is well settled that, although no reasons in arrest are filed, yet "if the court, upon a review of the whole case, are satisfied that he has not been guilty of any offense in

law, they will of themselves arrest the judgment:" 1 East, 146; 11 Harg. St. Tr., 299; 1 Wat. Arch. Cr. Pl., 672. But it is said that "if from the evidence on the trial there is a reasonable ground to believe the defendant guilty, and a new indictment can be framed upon which he may be convicted, the court may order him to be recommitted," etc.: *Ib.*, 672. Without indicating any opinion as to the guilt or innocense of the prisoners, let the judgment upon the present insufficient indictment be arrested, but as there was a conviction and judgment on a bad indictment, let the plaintiffs in error be recommitted to prison to answer any indictment or indictments that may. be found against them during the next term of the Criminal Court of Rutherford county, or give bail, if they can, for their appearance to that end.

Let the judgment be arrested and reversed.